# Griel & Bro. *v.* Lehman, Durr & Co.

## *Lien for Advances.*

1. *To create a lien for advances the statute must be complied with.*—To constitute a valid crop lien for advances, not only the form but the spirit of the statute must be complied with in every essential particular.

2. *It is unnecessary to specify the land on which the crops will be produced.* The law directs that the instrument creating the lien shall be recorded in the county in which the makers of it reside; but it does not require that the land on which the crops are to be raised shall be specified.

3. *A stranger can not object that a contract is usurious.*—It is well settled that a stranger to a transaction will not be allowed to object that there was usury in it.

APPEAL from the Circuit Court of Montgomery.
Tried before the Hon. JAMES Q. SMITH.
The facts are contained in the opinion.

W. A. GUNTER, and J. T. HOLTZCLAW, for appellant. 1. The proper construction of the law, giving a lien upon crops for advances, requires that the particular crop should be specified, so as to give notice to the world of the lien upon it, and the extent of the incumbrance. Both the language and the purpose of the statute, alike require that the particular crop advanced on, should be identified in the recorded instrument, so that notice should be given to the world, and the credit intended to be strengthened should not be crippled.

2. The contract in this case does not specify the crop on which the advance was made, nor does it appear that it was to operate on all the crops of the borrower. It is too uncertain to give effect to the statutory lien under the Revised Code, §§ 1858–9; 27 Ala. 437. The statute does not require in so many words that the name of the advancer should appear in the writing, or that the contract should be in the English language, but, we think, the name of the advancer should appear, and that, if the contract recorded, was in the Hebrew or Choctaw language, it would not be notice.

3. The purpose of recording the contract was to apprise the world of the particular lien. If the lien were to operate upon ten different crops in ten different counties and be recorded in only one, it would open a wide door to fraud, and the statute would cause oppression to the people, and be a hindrance to commerce. It is easy for the person seeking the benefit of this *new right*, to comply with the terms of the statute.

CLOPTON, HERBERT & CHAMBERS, and E. P. MORRISETTE, for the appellees.—1. While it is essential that the requirements of the statute shall be complied with, it is not essential that anything more should be done. The existence of four things is necessary to give the lien, viz: 1. The advance must be made in some of the articles prescribed in the statute, or money furnished with which they can be purchased. 2. Such advancement must be made *bona fide*. 3. It must be declared in writing that such advance was obtained *bona fide* for the purpose of making a crop, and without it the party obtaining the advance would be unable to procure the necessary teams, implements and provision, with which to make a crop; and, 4. Such note or writing must be recorded within sixty days in the office of the judge of probate of the county in which the person obtaining the-

advance resides. The courts can not *add to or take away* any of these essential particulars.

2. The legislature designed to make the notice effectual, and to provide for a record of the note in that county where search would be naturally made; although the person obtaining it might cultivate land in counties other than that in which he resided, the latter was chosen as the place of record and notice.

3. The evidence of the witness that the advance was to enable the borrower to make his crops generally; not on one, but on all his plantations, was proper. It did not vary, alter, enlarge, or contradict the writing. It was simply to identify the crop alluded to and mentioned in the writings.

4. It was not necessary to constitute a lien that any particular crop should be mentioned. If there was any ambiguity it was latent, and could be explained by oral testimony. 2 Phil. Ev. (9 ed.) 297, 329; 1 Greenl. Ev. § 297; Broom's Leg. Max. pp. 474–6. The appellants had constructive notice of the lien, because the instrument was recorded according to the requirements of the statute. This was sufficient to put the appellants on inquiry, and if they failed to make enquiry they were guilty of negligence, and have no remedy.—13 Ala. 50; 16 Ala. 581; 22 Ala. 743.

5. The charge requested by the appellant intimating the existence of usury in the transaction was properly refused. The party to the contract alone could have raised the objection; a stranger can not do it.—45 Ala. 429, 582.

6. The history of this statute and the time of enactment show that it should be liberally construed, in order that all the benefits intended by it should be realized by the people. It was enacted in January, 1866, when our fields had been desolated, our people impoverished, and confidence destroyed. It was the confidence reposed in this statute that brought foreign capital here, distributed it among our planters "to grow green again and ripen to future harvests."—6 P. 109; 33 Ala. 674.

MANNING, J.—The bales of cotton which are the subject of this controversy, were a part of the crop made in 1875 by one Ross. He cultivated several farms that year, not all of them in the same county. He resided himself in Chambers county. Under "the crop-lien law," (Code of 1876, §§ 3286 (1858), 3287 (1859) and 3288 (1860), he obtained advances of appellees, Lehman, Durr & Co., and executed to them notes or writings therefor in the form pre-

scribed by the Code, which were recorded, as it provided, in Chambers county, where Ross resided.   The cotton in controversy was raised on a farm in Elmore county.   The objections to the writings, under which appellees claim this cotton by virtue of a crop-lien under the statute,—are, that they do not specify the farm on which the crop was to be made, and were not recorded in the county where that farm was situated.

There is no question that the advances were made in good faith to enable Ross to make a crop.   In the case of *Boswell & Wooley v. Carlisle, Jones & Co.* 55 Ala. 554, the moneys due the former were not for advances made to enable the borrower to raise a crop ; but an untrue allegation that they were, which the person who signed the writing testified he did not know was in it, was contained therein.   And it was in reference to that case that we are represented, inaccurately, as having said : " To constitute a valid crop-lien for advances, not only the form but the spirit of the statute must be complied with in every essential particular."   In the present case there is no pretence that the writings contain any misrepresentation, or that there was any unfairness between the advancers, Lehman, Durr & Co., and Ross.

The cotton was brought from Elmore county into Montgomery, and sold here to appellants by one Danforth, who said it had been given to him by Ross for wages due from the latter : and possession of it was obtained by Lehman, Durr & Co. through a suit against Ross, commenced by a writ of attachment according to the statute.   The only question presented, in this relation, is the one before mentioned ; that is whether the writing was not insufficient to create a lien on the cotton in controversy, by reason of its not specifying the farm on which the crop was to be made and of its not being recorded in Elmore county ?   For an answer to this question, we must look to the statute.

This act of legislation was evidently passed with reference to the condition of the country after the late civil war.   Of land to be tilled there was no end ; and unsettled and needy laborers were abundant.   But " horses, mules, oxen, necessary provisions and farming tools and implements " were scarce ; and those who had farms, or could easily obtain them, were generally without money; while the land owners were, to a large extent, in debt, and their lands under mortgages.   It seemed, therefore, to the General Assembly that it would be a good policy, one of encouragement to the great and vital interest of the State, agriculture, to provide by

this crop-lien law, a security, which should take precedence of any other, except the landlord's lien for the payment of rent, and not be impaired by exemption laws, for ensuring the payment or reimbursement of those who would advance any of the articles aforesaid, or money with which to buy them, in order to enable the persons to whom such advances should be made, to cultivate their lands. This security was to be afforded by a lien on the crops these persons should respectively, be thus enabled to make. And the statute providing for it, prescribes all that the writings which are to be the evidence of the lien, must contain,—and when and where they shall be recorded. It does not require that the land shall be specified on which the crops are to be made. And it directs that the writings shall be recorded in the county where those who executed them reside. If the law needs amendment in these respects, it is for the legislature to amend it. We are not authorized to add any thing to the enactment.

Whether appellants would have been benefited or not, if the law had been as they say it should be, we need not inquire. When the cotton was taken away (as in this instance it was, and into another county,) from the farm on which it was grown, it could not be recognized as a product of that place. It would generally be more easy to ascertain *whose* it originally was, than *where* it had been raised; or if the latter was known, there would rarely be any difficulty in learning whose the place was, that year. Certainly until the name of the person who made the crop, be ascertained, it could not be discovered by the records, whether there was a crop-lien on it or not. And the name of this person being known, the law informs everybody that it is in the county of his residence, that search must be made for the evidence of such a lien.

We think the objections made to the instrument in this case are not well founded: and as before mentioned, there is no pretence that there was any lack of good faith in taking it.

It follows also from the fact that the objections to the instrument were not well founded, that the objection resting upon them, made to the introduction of the record of the attachment suit, was properly overruled.

The testimony of Morrisette was introduced, with reference to the evidence that Ross cultivated several farms in 1875, and to show that the advances he received from Lehman, Durr & Co. were not made for any particular farm, but to support him in his business as a planter wherever carried

on. It was directed against any suspicion that advances which have been made for the cultivation of one tract of land, were improperly employed to charge the crop made on another for the payment of them. The evidence, therefore, was not in aid of—much less to vary—the contract of which the writings were the evidence,—but to repel any inference against the honesty of the transaction. It was not illegally introduced.

The charge asked and refused concerning the subject of usury, as framed, was abstract. It does not ask the court to decide on the contract before it, but to instruct the jury that a contract containing certain terms *may* be usurious. It does not mention all the provisions of the contract in evidence. Besides, it is well settled that a stranger to a transaction will not be allowed to object that there was usury in it.

Let the judgment of the Circuit Court be affirmed.